**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 05-1473

DANIEL L. FISHER,

Plaintiff - Appellant,

versus

JO ANNE B. BARNHART, COMMISSIONER OF SOCIAL
SECURITY,

Defendant - Appellee.

Appeal from the United States District Court for the Northern District of West Virginia, at Elkins.  Robert E. Maxwell, Senior District Judge.  (CA-03-94-2)

Argued: March 17, 2006                   Decided: May 16, 2006

Before NIEMEYER, LUTTIG,[1] and KING, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Travis Michael Miller, BAILEY, STULTZ, OLDAKER & GREENE, P.L.L.C., Weston, West Virginia, for Appellant.  Brian Christopher O'Donnell, SOCIAL SECURITY ADMINISTRATION, Philadelphia, Pennsylvania, for Appellee.  **ON BRIEF:** Donna L. Calvert, Regional Chief Counsel, Region III, Connie Hoffman-Healey, Assistant

---

[1]Judge Luttig heard oral argument in this case but resigned from the court prior to the time the decision was filed.  The decision is filed by a quorum of the panel pursuant to 28 U.S.C. § 46(d).

Regional Counsel, Nora Koch, Supervisory Attorney, SOCIAL SECURITY ADMINISTRATION, Office of the General Counsel, Philadelphia, Pennsylvania; Thomas E. Johnston, United States Attorney, Helen Campbell Altmeyer, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

Daniel Fisher of Erbacon, West Virginia, filed a Social Security claim for Disability Insurance Benefits and Supplemental Security Income payments, complaining of neck, back, shoulder, and arm pain, coupled with a limited intellect. The administrative law judge ("ALJ") determined that, even though Fisher suffers from some physical and mental limitations, he retains the functional capacity to work in many jobs and therefore is not legally disabled. The Appeals Council declined to review the ALJ's decision. Fisher commenced this action to review the ALJ's determination, and the district court granted the Commissioner's motion for summary judgment and denied Fisher's. We affirm.

I

Fisher was born in 1956 and attended school through eighth grade. He has made a living as a laborer in the timber industry, most recently as a forklift operator. On June 15, 2001, Fisher applied for Social Security disability benefits, alleging that he had become disabled on March 27, 2001, and could not return to his job.

Fisher's primary complaint is of pain, and since 1997, different doctors have given Fisher pain injections, muscle relaxants, and steroids for low back, neck, shoulder, and left elbow pain. Doctors reviewing MRIs of Fisher's spine from 1998

through 2002 concluded that Fisher had a degenerative disc disease and bulging in his lower back (at vertebrae L4 through S1). They also concluded that he had a degenerative disc disease in his lower cervical vertebrae (at C5 through C6) and "abnormal material" thereabouts, likely from a herniated disc or scarring. In March 2001, doctors performed an anterior cervical discectomy to relieve Fisher's neck and shoulder pain.

In the months following the operation, Fisher continued to feel pain, and Dr. James Weinstein, a neurosurgeon, expressed the opinion that, because Fisher's disc degeneration had stabilized, his pain probably came from strain, sprain, or vertebral fusion at the site of his discectomy. Weinstein advised exercise and walking.

Fisher reported left elbow pain in 2000, and doctors at Webster County Memorial Hospital diagnosed tennis elbow. Doctors at Braxton County Memorial Hospital confirmed this diagnosis in 2001, noting also the absence of evidence of any fracture or dislocation.

In addition to complaining of pain, Fisher complains of disabling mental and psychological limitations. After he filed his claim for benefits, Fisher submitted to two mental and psychological evaluations in February 2002. Morgan Morgan, M.A., concluded that Fisher suffers from an adjustment disorder with depressed mood and has a history of alcohol abuse. Examiner Morgan

also concluded that Fisher has borderline intellectual functioning, based on a Verbal IQ of 72, Performance IQ of 79, Full IQ of 74, and achievement testing showing that Fisher can read, spell, and do math at a fifth or sixth grade level. The other examiner, Frank Roman, Ed.D., concluded that Fisher functions with only moderate limitations on his ability to understand, perform, and carry out detailed instructions; his ability to maintain attention and concentration for extended periods; and his ability to work within a schedule, maintain regular attendance, and be punctual. In so concluding, Examiner Roman found that Fisher is not significantly limited in, inter alia, his ability to understand and perform short and simple instructions, his ability to sustain an ordinary work routine, his ability to complete a normal workday without interruption, and his ability to respond appropriately to changes in the work setting. Examiner Roman concluded that Fisher can handle one- and two-step instructions in low stress settings, can perform routine activities of daily living, and has moderate difficulty with social functioning and in maintaining concentration, persistence, and pace.

At his hearing before the ALJ, Fisher testified about his pain, describing pain in his back, neck, shoulder, and left arm. Because of the pain, he stated that he sometimes needs help to get up in the morning and that sometimes during the day he must lie down and apply heat. Testifying to his daily life habits, Fisher

said he drives daily and occasionally takes long drives; he fishes and hunts once a month; he gardens; he walks a quarter-mile each day; he mows his lawn on a riding tractor; and he takes his 16-year old son to football games. He stated that he has reduced his alcohol consumption to two 40-ounce drinks a month.

The ALJ denied Fisher's application for benefits in a written decision that he issued on November 22, 2002.[2] The ALJ found that Fisher no longer performs substantial gainful activity because he has not returned to his job since his discectomy and that Fisher suffers the severe impairments of borderline intellectual functioning, an adjustment disorder, degenerative disc disease, high blood pressure, left tennis elbow, and low back pain syndrome. The ALJ found, however, that these impairments are not severe enough "to meet or medically equal" the impairments for which Fisher would be deemed legally disabled. The ALJ also determined Fisher's residual functional capacity in order to decide whether Fisher could continue to perform his prior forklift work and, if not, whether there are any other jobs existing in significant numbers that Fisher could perform.

---

[2]Fisher's application was first denied by a state agency on August 14, 2001, from which Fisher asked the agency to reconsider its decision. The state agency denied his application again on March 12, 2002. Fisher then asked for a hearing before an ALJ, which took place on July 24, 2002, and the November 2002 denial at issue in this case sprang from that hearing.

Considering all of the documented medical evidence and Fisher's own testimony about his symptoms and life habits, the ALJ found that Fisher's adjustment disorder and borderline intellectual functioning mildly restrict Fisher's activities of daily living and cause him a mild difficulty with social functioning and a moderate difficulty in maintaining concentration, persistence, and pace. The ALJ also found that Fisher has physical limitations due to his back and arm pain, determining that Fisher can lift only 10 to 20 pounds, sit for 2 hours a day, and stand or walk for 6 hours. He found that Fisher "cannot perform complex tasks," cannot endure temperature extremes, and cannot lift his left arm above his head.

The ALJ concluded that Fisher's residual functional capacity forecloses Fisher's return to his forklift operator position but that "there are a significant number of jobs in the national economy that [Fisher] could perform." Accordingly, the ALJ denied Fisher's application for disability benefits.

After the Social Security Appeals Council denied Fisher's request for review in September 2003, Fisher commenced this action in October 2003 under 42 U.S.C. §§ 405(g) and 1383(c)(3) to review the ALJ's denial of disability benefits. On cross-motions for summary judgment, the magistrate judge recommended granting the Commissioner's motion and denying Fisher's, and the district court adopted the magistrate judge's report and recommendation on March 29, 2005. This appeal followed.

-7-

In Social Security benefits cases, the ALJ is charged with performing a five-step inquiry to determine if an applicant is eligible for Social Security benefits. See 20 C.F.R. § 404.1520 (2005). Sequentially, the ALJ must determine (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant's medical impairments are severe; (3) whether the claimant's impairments meet or exceed the severity of certain impairments; (4) whether the claimant, based on his residual functional capacity, can perform his past relevant work; and (5) whether the claimant, based on his residual functional capacity, can perform other work. The ALJ's factual findings must be upheld "if they are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). Accordingly, "we do not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [ALJ]." Id.

Fisher mounts three challenges to the ALJ's rejection of his application for benefits. First, he contends the ALJ failed Social Security Ruling 96-7p and erroneously found Fisher's testimony on his symptoms to be not credible. Second, Fisher argues that neither the residual functional capacity nor a hypothetical question posed to a testifying vocational expert accurately

reflected his mental and psychological limitations.  Third, Fisher argues the ALJ failed Social Security Ruling 00-4p by not reconciling the vocational expert's testimony with the Dictionary of Occupational Titles.  We address each of these challenges in turn.

A

Two nearly identical regulations, 20 C.F.R. §§ 404.1529 and 416.929, explain how the Social Security Administration evaluates a claimant's symptoms to determine whether he or she is disabled, and Social Security Ruling 96-7p clarifies these regulations by explaining when and how an ALJ can weigh the credibility of the claimant's own testimony.  First, the ALJ must determine whether medically determinable mental or physical impairments can produce the symptoms alleged.  Second, the ALJ must evaluate the claimant's testimony about his subjective experiences.  If the ALJ discredits the claimant's testimony, he must give "specific reasons" that are "grounded in the evidence."  See Soc. Sec. R. 96-7p; see also Craig, 76 F.3d at 591-96 (anticipating the standard set forth in Ruling 96-7p as applied to allegations of pain).

The ALJ committed no error here.  The ALJ found, first, that Fisher had degenerative disc disease, that he sustained a cervical discectomy, and that he had low back pain syndrome and tennis elbow, all of which are physical impairments "that could reasonably

be expected to produce" the neck, shoulder, back, and elbow pain of which Fisher complained. Similarly, the ALJ found that Fisher has borderline intellectual functioning, a mental impairment that could substantiate Fisher's alleged difficulty with reading and writing.

After determining the physical and mental impairments, the ALJ weighed Fisher's testimony about their extent. Despite Fisher's allegations of disabling severe pain, the ALJ found that Fisher is not totally disabled because he still is able to perform activities of daily living, such as hunting, fishing, and walking. Moreover, Fisher visits doctors less frequently, and his treating physicians have determined that he suffers "only moderate, or mild to moderate, pain." Evaluating Fisher's alleged mental limitations, the ALJ concluded from Fisher's own testimony that he "pays the bills" and "read[s] and write[s] a little," showing that he is not incapable of reading and writing.

Thus, the ALJ found that Fisher's testimony "was not fully credible or consistent with the record as a whole as to the nature and extent of [Fisher's] impairments and to the extent that total disability is alleged." In making his findings, however, the ALJ did not entirely reject Fisher's subjective evaluation of his symptoms. While the ALJ found that pain did not totally disable Fisher, the ALJ did take Fisher's pain allegations into account to the extent that they were credible, finding that Fisher's back and arm pain restrict his physical movements.

In short, the ALJ fully comported with the sequential two-step credibility evaluation prescribed by Social Security Ruling 96-7p by making findings, supported by reasons, with respect to Fisher's alleged symptoms, the medical record, and Fisher's own testimony.

B

Fisher next challenges two related determinations, arguing that the ALJ's residual-functional-capacity determination failed to reflect Fisher's actual mental limitations and that a hypothetical question that the ALJ posed to a testifying vocational expert failed to communicate Fisher's actual mental limitations.

Fisher's first challenge amounts to a sufficiency-of-the-evidence challenge. The ALJ concluded that Fisher's borderline intellectual functioning manifested itself by giving Fisher moderate difficulty maintaining concentration, persistence, and pace, which prevents him from performing complex tasks. Fisher argues that this residual functional capacity fails to account for his low IQ test scores, poor concentration, deficient recent memory, and difficulties handling instructions. We disagree. The ALJ's decision is supported by sufficient evidence. Examiner Morgan determined that Fisher suffered from borderline intellectual functioning, and Examiner Roman determined that Fisher had moderate difficulty with instructions, concentration, and working on a schedule. The ALJ directly incorporated Morgan and Roman's

determinations and found that these impairments affected Fisher's ability to work only by preventing him from performing complex tasks. This determination is entirely consistent with the bulk of Examiner Roman's determination that Fisher has no significant limitations on his ability to understand and perform "simple" instructions, to sustain an ordinary work routine, and to complete a normal workday without interruption.

For this same reason, Fisher's challenge to the ALJ's hypothetical question must also fail. The opinion of a vocational expert is not helpful if it is not delivered "in response to proper hypothetical questions which fairly set out all of [a] claimant's impairments." Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989) (emphasis added). As we recently held in Johnson v. Barnhart, 434 F.3d 650 (4th Cir. 2005), a hypothetical question is unimpeachable if it "adequately reflect[s]" a residual functional capacity for which the ALJ had sufficient evidence. See id. at 659 (emphasis added). Here, the ALJ told the expert to assume that Fisher is capable of only "unskilled work"[3] and that he "cannot perform complex tasks," which repeats the residual functional capacity that we have found is supported by substantial evidence. See also Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2001) ("We find

---

[3] "Unskilled work" is a term of art, defined by regulation as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a).

-12-

that [a hypothetical question] describing [the claimant] as capable of doing simple work adequately accounts for the finding of borderline intellectual functioning"). Even if "complex tasks" is superficially ambiguous as between "physically complex tasks" and "mentally complex tasks," the vocational expert evidently understood it to mean the latter because neither of the jobs the expert identified in response to the hypothetical question requires a worker to perform mentally complex tasks. Thus, the ALJ's hypothetical question fairly conveyed Fisher's functional capacity to the expert.

Fisher contends that hypothetical questions must be medically specific. As Johnson and Walker dictate, however, the ALJ has some discretion to craft hypothetical questions to communicate to the vocational expert what the claimant can and cannot do. Moreover, it is the claimant's functional capacity, not his clinical impairments, that the ALJ must relate to the vocational expert. A claimant very well might have some impairments under control such that they do not manifest themselves in any way that would limit the claimant's capacity for work. Fisher tacitly recognizes this principle. For example, even though Fisher was diagnosed as an alcohol abuser, he does not now claim that the vocational expert should have been told of this diagnosis because he claims to have his alcohol abuse under control.

Perhaps more importantly, in arguing that an ALJ must include a list of the claimant's medical impairments in his hypothetical question to the vocational expert, Fisher fundamentally misunderstands the scope of the vocational experts' expertise. Vocational experts are not experts in psychology who are qualified to render opinions on how the claimant's ailments might be reflected in his capabilities; rather, they are employment experts who know the mental and physical demands of different types of work, see 20 C.F.R. § 404.1560 ("We may use the services of vocational experts or vocational specialists . . . to obtain evidence we need to help us determine whether you can do your past relevant work, given your residual functional capacity" (emphasis added)), or how many specific jobs exist in the local and national economies, see id. § 404.1566.

Because the ALJ's residual-functional-capacity determination is supported by substantial evidence and because the challenged hypothetical question merely incorporated that determination, the ALJ committed no error.

C

Finally, Fisher contends that the ALJ erred in relying on the vocational expert's testimony without first obtaining a reasonable explanation for conflicts between his testimony and the Dictionary of Occupational Titles published by the Department of Labor.

-14-

Social Security Ruling 00-4p clarifies 20 C.F.R. § 404.1566, which states, without more, that ALJs will consider both the Dictionary of Occupational Titles and vocational expert testimony to determine whether a Social Security claimant can find work suited to his residual functional capacity. Noting that the sources should typically be consistent, Ruling 00-4p nonetheless provides that "When there is an apparent unresolved conflict between [vocational expert] evidence and the [Dictionary of Occupational Titles], the adjudicator must elicit a reasonable explanation for the conflict before relying on the [vocational expert] evidence to support a determination or decision about whether the claimant is disabled." Specifically, the ALJ "will inquire, on the record, as to whether or not there is such consistency."

Ruling 00-4p acknowledges, however, that neither the Dictionary of Occupational Titles nor the vocational expert's testimony "automatically 'trumps' when there is a conflict"; instead, the ALJ is obligated to resolve the conflict by deciding if the vocational expert's explanation for the conflict is reasonable. The vocational expert's conflicting testimony can be used, for instance, if the ALJ finds that it is based on "other reliable publications" or the expert's own "experience in job placement or career counseling." However resolved, the ALJ "must resolve this conflict before relying on the [vocational expert]

-15-

evidence to support a determination or decision that the individual is or is not disabled" and must "explain in the determination or decision how he or she resolved the conflict."

Fisher maintains that the ALJ's determination that he is able to perform other work is based on an unresolved conflict and therefore must be reversed. The vocational expert offered two jobs in response to a hypothetical question from the ALJ:

> The first position I would advance given the hypothetical would be that of a nursery worker. That's found in [Dictionary of Occupational Titles] 405.681-010. It's at the light exertional level. Has an SVP [Specific Vocational Preparation] of one, which places it at the very low simple, routine, one, two step work. Nationally, there's 29,401 of those positions and regionally, there is 1,850. That's Ohio, Kentucky, and West Virginia. The second position I would advance at that level – well, let me see about it, Your Honor. Would be that of a laundry worker. That's found in 304.685-010 in the DOT. It's light exertional level. Has an SVP of two, which is unskilled. Very routine, one, two step work. Nationally, there's 210,761 of those positions and regionally, which is Ohio, Kentucky, West Virginia, there's 19,156. This would accommodate a sit/stand option because it's involved basically in a lot of folding clothes and it would provide for a sit/stand option.

The ALJ followed up and asked the vocational expert why he believed these two positions would accommodate a sit/stand option. The expert replied that he formed this conclusion based on his experience. Accordingly, in the ALJ's final determination, the ALJ concluded:

> Although the claimant's exertional limitations do not allow him to perform the full range of light work . . . there are a significant number of jobs in the national economy that he could perform. Examples of such jobs

include work as a nursery worker (SVP 1, DOT 405.681-010) (29,401 jobs in the nation and 1850 jobs in the tri-state region of West Virginia, Ohio, and Kentucky) and laundry worker (SVP 2, DOT 304.685-010) (210,761 jobs in the nation and 19,156 jobs in the tri-state region of West Virginia, Ohio, and Kentucky).

On appeal, Fisher points out that the Dictionary of Occupational Titles does not have either code in it; that there are multiple "laundry worker" entries in the Dictionary; and that there are no entries for "nursery worker." Assuming this is the sort of conflict regulated by Social Security Ruling 00-4p, Fisher argues the ALJ failed to explain how he resolved the conflict in his decision, which simply states that "[t]he information provided by the impartial vocational expert is consistent with the Dictionary of Occupational Titles."

We should note first note that, in all other respects, the ALJ abided by Ruling 00-4p -- he inquired on the record whether the vocational expert's testimony was consistent with the Dictionary of Occupational Titles; he elicited a reasonable explanation for the vocational expert's knowledge of the various jobs' sit/stand option, which is not provided in the Dictionary; and he stated in his ruling that the expert's testimony was consistent with the Dictionary. The narrow question presented to us is whether the vocational expert's testimony conflicts with the Dictionary of Occupational Titles.

As a primary matter, it is not clear that Social Security Ruling 00-4p even applies to citation errors of the sort involved

-17-

in this case. Fisher has assumed that it does, and the Commissioner has engaged Fisher on his own arguments. Textually, however, there are strong signals that the Ruling is irrelevant to the expert's mistake. The Ruling states that it governs "conflicts in occupational information," not erroneous job titles and codes. Moreover, the Ruling provides a clear remedy -- i.e., reconciliation by reasonable explanation -- that is meaningless when the testifying expert misremembers the proper Dictionary job title and code. An ALJ's decision or a vocational expert's testimony could hardly provide a reasonable explanation for citing to an erroneous Dictionary entry. Reasoning that an ambiguous ruling only applies where its remedy is not meaningless, we would be inclined to conclude that Social Security Ruling 00-4p is not even implicated by the vocational expert's mistake in Fisher's case. But we need not conclusively interpret Ruling 00-4p today because, even if we assume that the Ruling does apply, the vocational expert's testimony is not in conflict with the Dictionary under the interpretation proposed by Fisher.

Fisher rests his appeal on Burns v. Barnhart, 312 F.3d 113 (3d Cir. 2002), in which the Third Circuit addressed a similar, yet ultimately distinguishable, situation. In Burns, the vocational expert testified that the claimant could work as a "laundry sorter" or "packer." The expert did not attempt to associate a Dictionary code with either generic job title. As in this case, neither job

title has an actual entry in the Dictionary of Occupational Titles. After deciding that the case had to be remanded because of a faulty hypothetical question, the court, in dictum, advised the ALJ to seek additional testimony from a vocational expert because the court, unable to determine which Dictionary entries were implicated by the testimony, was "not convinced . . . that [the vocational expert's] testimony necessarily conflicted with the DOT." Id. at 128 (emphasis added). Importantly, the Third Circuit recognized that an erroneous citation to the Dictionary of Occupational Titles is not per se reversible error.

We are convinced that the vocational expert's testimony in this case does not necessarily conflict with the Dictionary of Occupational Titles. As noted by the Commissioner and the district court below, a change of a single digit in each job code in the vocational expert's testimony leads one to the entries for "domestic laundry worker" (DOT 302.685-101), requiring light strength and SVP 2, and for "flower picker" (DOT 405.687-010), requiring light strength and SVP 1. The substantive characteristics of these jobs, as related in the Dictionary, are identical to the substantive characteristics of the jobs identified in the expert's testimony. The job titles are substantively similar; they are practically synonyms. The job codes are simply off by a single digit.

We conclude that the only reasonable interpretation of the entirety of the vocational expert's testimony is that he misremembered and, consequently, misspoke the job titles and codes in question.  The Dictionary entries he meant to mention are not in conflict with his descriptions of them.  Thus, although we are troubled that the ALJ thoughtlessly entered the expert's errors into the final determination of Fisher's application, we find no reversible error under Fisher's own interpretation of Social Security Ruling 00-4p, saving for another day the resolution of whether Ruling 00-4p applies to this kind of testimonial mistake at all.

*   *   *

For the reasons given, the judgment of the district court is


AFFIRMED.